**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 09 B 42248 |
| | ) | Chapter 7 |
| RONALD F. MORGAN, JR., | ) | Judge Donald R. Cassling |
| | ) | |
| Debtor. | ) | |
| | ) | |
| DAVID E. GROCHOCINSKI, | ) | |
| Trustee of the Chapter 7 | ) | Adversary No. 11 A 00580 |
| bankruptcy estate of | ) | |
| Ronald F. Morgan, Jr., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RONALD F. MORGAN, JR., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

David E. Grochocinski, the Chapter 7 trustee (the "Trustee") for the bankruptcy estate of

Ronald F. Morgan, Jr. (the "Debtor") has objected to the Debtor's discharge under 11 U.S.C. §

727(a)(3), (a)(4)(A), and (a)(7).[1]  For the reasons stated below, the Court sustains the Trustee's

objections and denies the Debtor's discharge.

## I.  JURISDICTION AND PROCEDURE

The Court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and

Internal Operating Procedure 15(a) of the United States District Court for the Northern District

of Illinois.  It is a core proceeding under 28 U.S.C. § 157(b)(2)(J).

---

[1] The complaint also originally contained Count II, which was brought under 11 U.S.C. § 727(a)(2).  On December 12, 2012, the Trustee dismissed that count of the complaint.  Thus, the Court will not address the § 727(a)(2) count.

## II. BACKGROUND

The Debtor filed a voluntary Chapter 7 bankruptcy petition on November 6, 2009. (Ans. to Compl. at ¶ 5.)   Although the Debtor filed his petition as an individual debtor, an understanding of the issues in this case requires the Court to consider the roles the Debtor played in several separately incorporated entities, and the disposition of those issues compels the Court to determine whether the Debtor adequately played the additional roles of honest debtor and fiduciary of creditors.

Once a union carpenter, the Debtor built a successful drywall installation and interior construction business whose complex structure eventually included the following:

- RFM Enterprises, Inc., d/b/a Newgrom Construction Company ("RFM"), the Debtor's primary enterprise, a construction subcontractor that performed general carpentry and installed drywall and acoustical tile. (*Id.* at ¶ 10.) The Debtor was its president and sole shareholder. (*Id.* at ¶ 6.)

- Suburban Equipment Corporation ("SEC"), formed on the advice of the Debtor's accountant to own vehicles for the purpose of leasing them to RFM, thus shielding RFM from liability in the event of an accident involving the vehicles. (*See id.* at ¶¶ 50-52.)   The Debtor was the president and sole shareholder of SEC. (*Id.* at ¶ 49.)

- AMI, Inc. ("AMI"), also formed on advice of the Debtor's accountant, solely to process the Debtor's personal payroll, thereby reducing his contributions to union benefit funds from what they would have been had the Debtor been paid directly by RFM. (*See id.* at ¶¶ 15-16.)   The Debtor was the president and sole shareholder of AMI. (*Id.*)

- Chris' Taping Company ("CTC"), formed to provide taping and drywall-finishing services to a single customer – RFM, which shared office space with CTC and paid the rent and utilities thereon. (*See id.* at ¶ 37.) The Debtor's sister, Christine Peterson ("Peterson"), was the president and sole shareholder of CTC as well as the office manager of RFM. (*See id.* at ¶ 28.) The Debtor testified that Peterson and he founded CTC to "kind of keep everything in house" and avoid back-charges on RFM projects. He also testified that they did not intend that CTC would make a profit.   Pre-petition, RFM's only payments to CTC were reimbursements for its expenses.

It is a testament to the Debtor's financial acumen that the various enterprises flourished.

Prior to 2007, RFM grossed as much as $12 million per year and at times employed as many as 100 workers.

Besides his construction-related businesses the Debtor owned a fair amount of real estate. In addition to his personal residence in Wheaton, Illinois and a townhouse in Hawaii, the Debtor held an 83 percent interest in Maxx Developers, Inc., a corporation that owned another residential property in Wheaton, as well as a vacant lot in Hawaii. In connection with these holdings, the Debtor consulted with both a commercial banker and a real estate banker. At trial, he described himself as being "on a personal basis" with each professional advisor.

Overall, the Debtor appears to be an experienced, knowledgeable, and astute businessman and "hands on" manager who readily avails himself of professional advice. The evidence belies any characterization of the Debtor as inattentive or naïve in business matters.

From 2007 through 2009, the Debtor's fortunes declined along with those of the construction industry and the U.S. economy in general. By August of 2009, RFM had substantially completed work on its last major project, the Kaneland Middle School project (the "Kaneland Project") in Maple Park, Illinois. Around the same time, RFM learned that it had lost its bid for a major new project for a church in Aurora, Illinois, (the "Church Bid") that would have generated revenue of $1.2 to $1.4 million. Out of work and with no prospect of new projects, the Debtor consulted bankruptcy attorneys in September of 2009, and, on November 6, 2009, the Debtor and RFM both filed Chapter 7 bankruptcy petitions. (Pl. Ex. Nos. 1 & 2.)

In the period commencing three months before filing his bankruptcy petition, the Debtor took the following actions to mitigate the impact of RFM's looming failure upon his business and personal finances:

- He caused RFM to pay his related companies SEC, AMI and CTC in full, while paying unrelated creditors nothing or only a small percentage of what they were

3

owed.[2] The payments to CTC actually exceeded the amounts invoiced to RFM. As a result of these pre-petition insider payments, SEC, AMI and CTC received $267,562.50 out of the total of $610,463.63 paid to creditors during that period. (Pl. Ex. No. 2 at pp. 25-29.)

- In September of 2009, in order to accelerate payment of the balance owed by the general contractor on the Kaneland Project, the Debtor submitted a contractor's affidavit stating that all materials had been paid for, when in fact one of the suppliers was still owed $263,012.55. As a result of that material inaccuracy the contractor authorized payments directly to RFM with no provision being made for the unpaid supplier. The Debtor then funneled the bulk of those funds to CTC and left the supplier unpaid.

- In October of 2009, the Debtor submitted to RFM's secured lender a collateral report that included the failed Church Bid as an account receivable, t hereby overstating RFM's accounts receivable by about $1.4 million. The effect of submitting the overstated collateral report was to forestall the secured lender from calling the loan. (Pl. Ex. No. 4.)

- When the Debtor filed his bankruptcy petition he signed a Statement of Financial Affairs ("SOFA") that failed to list his ownership of a 1968 Ford Mustang and a Harley motorcycle, his alleged sale of those vehicles to his mother for $12,000 in the year preceding his bankruptcy, or any information as to what he did with the proceeds from the alleged sales. (Pl. Ex. No. 1 at p. 36.)

- The Debtor's SOFA also failed to disclose his interest in the Hawaiian condo, the fact that he had made a down payment of $155,000, and the fact that he received notice in September 2009 that his security deposit had been forfeited. Nor did the Debtor amend his schedules to disclose that within about two weeks of filing his bankruptcy petition he signed a contract retaining a Hawaiian attorney to represent him in litigation to recover the security deposit. (*Id.* at pp. 35-36.)

The Trustee filed this adversary proceeding seeking to deny the Debtor's discharge under

§ 727(a)(7) arguing that several pre-petition transfers to the Debtor's insiders were not disclosed;

under § 727(a)(4), arguing that the Debtor made material omissions in his bankruptcy schedules;

and under § 727(a)(3), arguing that the Debtor failed to keep adequate financial records.

---

[2] For example, in the 90 days preceding the petition date, West Suburban Bank was owed more than $1.3 million, but received payments of only $72,258, less than six percent of the amount it was owed. (Pl. Ex. No. 2 at pp. 28-29.) Westmont Interior Supply House was owed more than $236,012.55, but received payments of only $69,735.87, approximately thirty percent of the amount RFM owed it. (*Id.* at pp. 25-26.) RFM apparently made no payments to the Chicago Carpenters Trust Funds during this period, although it owed the union $269,490.63 for past-due pension and welfare contributions for the months August through October 2009. (*See* Pl. Ex. No. 2 at p. 16.)

The Debtor does not deny that he acted as described above. However, he argues that there are innocent explanations for each of these actions that excuse his behavior so that his discharge should not be barred. The Debtor contends that:

- The allegedly fraudulent pre-petition transfers to insider corporations were merely preferential payments to bona fide creditors and not fraudulent conveyances.

- The September contractor's statement was not materially false because he fully intended that RFM would eventually pay the supplier from other unidentified sources.

- The gross overstatement of RFM's accounts receivable in the October collateral report was the work of an unidentified employee.

- The two vehicles were omitted from his SOFA because the Debtor was simply never asked about them by his original bankruptcy attorney, nor did he see, review or sign the SOFA or the schedules. He further argues that the omission was not material.

- He believed that he had no claim to recover the forfeited $155,000 deposit for the Hawaiian condo and did not realize that he had actually signed a contract with a Hawaiian attorney to pursue just such a claim. The Debtor also argues that this omission was not material.

In short, when the Debtor is not attempting to shift the blame for these acts and omissions to his staff or to his bankruptcy attorneys, he blames his own financial naiveté and carelessness. For the reasons that follow, the Court rejects the Debtor's explanations and concludes that the Trustee has met his burden of proof that the Debtor's discharge should be denied under § 727(a)(3), (a)(4), and (a)(7).

## III.  APPLICABLE STANDARDS

The discharge provided by the Bankruptcy Code is meant to give the honest but unfortunate debtor a financial "fresh start." *In re Chambers*, 348 F.3d 650, 653 (7th Cir. 2003); *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). In exchange for that fresh start, the Code requires debtors to accurately and truthfully present themselves to the court.

5

*Stathopoulos v. Bostrom (In re Bostrom)*, 286 B.R. 352, 359 (Bankr. N.D. Ill. 2002), aff'd, No. 02 C 9451, 2003 WL 403138 (N.D. Ill. Feb. 20, 2003).

The party objecting to a debtor's discharge has the burden of proving the objection. Fed. R. Bankr. P. 4005; *First Federated Life Ins. Co. v. Martin (In re Martin)*, 698 F.2d 883, 887 (7th Cir. 1983) (noting that "the *ultimate* burden of proof in a proceeding objecting to a discharge lies with the plaintiff"). Objections to discharge under § 727(a) should be liberally construed in favor of debtors and strictly against objectors in order to grant debtors a fresh start. *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996). "The denial of discharge is a harsh result." *Henbest v. Meyer (In re Meyer)*, 307 B.R. 87, 91 (Bankr. N.D. Ill. 2004). The objector must establish all required elements of the objection by a preponderance of the evidence. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 966-67 (7th Cir. 1999).

## IV. DISCUSSION

### A.    Count I—11 U.S.C. § 727(a)(7)

Section 727(a)(7) mandates denial of a discharge in the event of a debtor's misconduct in any bankruptcy case filed separately from but related to the debtor's own case. *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996).

> The purpose and intent of Section 727(a)(7) of the Bankruptcy Code is to prevent debtors who are involved in several bankruptcy proceedings from failing to cooperate in a proceeding in which their own discharge is not at issue such as a corporate proceeding or a proceeding involving a partner or a relative and then, subsequently or simultaneously, obtaining an individual discharge in another case. Section 727(a)(7) is a statutory provision which ties related cases together so that misconduct in one case by an individual may be chargeable against that individual in other related proceedings.

*Associated Bank, N.A. v. Sever (In re Sever)*, 438 B.R. 612, 619 (Bankr. C.D. Ill. 2010) (quoting *Whiteside F.S. Inc. v. Siefkin*, 46 B.R. 479, 480-81 (N.D. Ill. 1985)).

In order for a discharge to be denied under § 727(a)(7), a movant must establish the following elements: (1) "the debtor has committed any act specified in paragraph (2), (3), (4), (5), or (6)" of subsection 727(a); (2) the act occurred "on or within one year before the date of the filing of the petition, or during the [debtor's] case;" and (3) the act was committed "in connection with another case, under this title or under the Bankruptcy Act, concerning an insider[.]"  11 U.S.C. § 727(a)(7).

 In this Count of the complaint, the Trustee alleges that the Debtor violated § 727(a)(2) and (a)(4)(A) in connection with RFM's bankruptcy case, and that under § 727(a)(7), those violations can be attributed to the Debtor and serve as a basis for the denial of his discharge.  The Court must first determine whether RFM is an "insider" of the Debtor.

In cases where the debtor is an individual, an "insider" includes a "corporation of which the debtor is a director, officer, or person in control[.]"  11 U.S.C. § 101(31)(A)(iv); *see also Posnanski v. Kosth (In re Kosth)*, Bankr. No. 09-82212, Adv. No. 09-8131, 2012 WL 863634, at *8 (Bankr. C.D. Ill. Mar. 13, 2012).  The Debtor was the president of RFM and he is listed as such on RFM's bankruptcy petition.  (Pl. Ex. No. 2 at p. 3).  In addition, the Debtor listed himself as the 100% owner of RFM on his Schedule B.  (Pl. Ex. No. 1 at p. 10.)  The Court therefore finds that RFM is an insider of the Debtor for purposes of § 727(a)(7) and next considers whether the Debtor violated § 727(a)(2) or (a)(4) in connection with RFM's bankruptcy case.

### 1.    The Debtor Violated § 727(a)(4) with Respect to RFM's Bankruptcy   Case

The Trustee alleges that the statements made by RFM in its SOFA concerning the transfers to CTC and AMI constitute false oaths under § 727(a)(4)(A) and that the Debtor, having caused the commission of those false oaths, is liable for them under § 727(a)(7).

Section 727(a)(4) bars a debtor's discharge if he knowingly and fraudulently makes a false oath in connection with the case. 11 U.S.C. § 727(a)(4)(A).   In order to prevail under § 727(a)(4)(A), a movant must establish five elements: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with the intent to deceive; and (5) the statement related materially to the bankruptcy case. *Stamat v. Neary*, 635 F.3d 974, 978 (7th Cir. 2011).   Omissions from bankruptcy schedules and SOFAs may constitute false oaths for purposes of § 727(a)(4).   *See Bostrom*, 286 B.R. at 360-61.   Indeed, "[c]omplete financial disclosure is a condition precedent to the privilege of discharge." *Glucona Am., Inc. v. Ardisson (In re Ardisson)*, 272 B.R. 346, 359 (Bankr. N.D. Ill. 2001).

### a.   The AMI Transfers

RFM compensated the Debtor, its sole shareholder and president, for services performed for the corporation.   (Ans. to Compl. at ¶¶ 6 & 14.)   RFM paid the Debtor's compensation through AMI.   (*Id.* at ¶¶ 15-17.)   In the three years preceding the bankruptcy filing, RFM transferred the following amounts to AMI for distribution to the Debtor: $180,400 in 2007; $213,200 in 2008; and $183,300 in 2009. (*Id.* at ¶ 17.)

The Court finds for the following reasons that AMI is an insider of RFM:   According to the Debtor's testimony and schedules, (1) AMI was created for the specific purpose of processing the Debtor's payroll from RFM; (2) AMI had no other activity than processing the Debtor's compensation from RFM; and (3) both AMI and RFM were entirely owned and controlled by the same individual -- the Debtor, who was the sole shareholder and president of both corporations.   Because AMI was an insider of RFM, the Court finds that RFM was obligated to include on its SOFA transfers made to AMI within one year of the petition date.

However, RFM reported no payments on its SOFA to insider creditors made within one year prior to its bankruptcy petition date. (Pl. Ex. No. 2. at p. 29.) Rather, the SOFA simply lists the Debtor as a creditor of RFM, and identifies him as "Owner, Director & Officer." (*Id.*)

For the reasons discussed below, the Court finds that the Trustee has proved all of the elements under § 727(a)(4)(A) by a preponderance of the evidence.

- **The Debtor made a statement under oath:** A debtor's bankruptcy schedules and SOFA are statements under oath for purposes of § 727(a)(4). *Norton v. Cole (In re Cole)*, 378 B.R. 215, 221 (Bankr. N.D. Ill. 2007). Therefore, the Court finds that the statement made on RFM's SOFA with respect to the AMI transfers constitutes a statement under oath for purposes of § 727(a)(4)(A).

- **The statement was false:** In response to question 3 of its SOFA, RFM denied that it had made payments to creditors who are insiders within one year prior to its bankruptcy petition date. (Ans. to Compl. at ¶ 34.) Because RFM in fact transferred a substantial sum to AMI, an insider, for distribution to the Debtor during the relevant time period, the Court finds that the omission of these transfers on RFM's SOFA is a false statement for purposes of § 727(a)(4)(A).

- **The Debtor knew the statement was false:** The Court does not find credible the Debtor's testimony that he did not know he was required to list transfers to insiders in the one-year pre-petition period on RFM's SOFA. The Debtor is an astute businessman, familiar with the preparation of sophisticated financial documents such as RFM's bid on a multi-million dollar project and the collateral reports required by his lender. It was surely not beyond him to understand what information was required to complete a SOFA, especially when he had bankruptcy counsel available to advise him. A debtor's duty of full disclosure requires him to carefully and truthfully answer all questions presented in the bankruptcy schedules and SOFA. *In re Famisaran*, 224 B.R. 886, 891 (Bankr. N.D. Ill. 1998). "Debtors have the ultimate responsibility for the accuracy of the information contained in their schedules, which cannot be avoided by playing ostrich." *Rafool v. Wilson (In re Wilson)*, 290 B.R. 333, 340 (Bankr. C.D. Ill. 2002). The Court concludes that the Debtor knew that RFM's SOFA contained a false statement, and that the third element required under § 727(a)(4)(A) has been established.

- **The Debtor made the statement or caused the omission with intent to deceive:** The Debtor is a sophisticated businessman who was knowledgeable enough to set up an interlocking series of corporations designed to minimize expenses and maximize income. He was responsible for preparing detailed records for his companies, including collateral reports for RFM's lender, and his attention to detail and business acumen resulted in annual revenues for his companies of up to $12 million. Based on the totality of the circumstances, the Court does not find credible the Debtor's testimony

9

that he did not know that he was required to list transfers to insiders in the one-year pre-petition period on RFM's SOFA. Instead, the Court finds that the Debtor knew he was required to cause RFM to make such disclosures, and he failed to do so intentionally. The Court therefore also finds that the Debtor acted with the requisite intent to cause RFM to omit the transfers to AMI on its SOFA under § 727(a)(4)(A).

- The omission was material: The Court further finds that the omission was material under § 727(a)(4)(A). An omission is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." *Stamat,* 635 F.3d at 982 (internal quotation omitted). The transfers to AMI between January 1, 2009 and the petition date totaled $183,300. This amount is significant and requires disclosure in order to provide the Trustee and the creditors of the estate the information necessary for administration of the estate.

Accordingly, the Court finds that RFM's failure to disclose on its SOFA transfers made to AMI within one year of RFM's petition date constitutes the making of a false oath under § 727(a)(4)(A). Because the Court further finds that the Debtor is responsible for this failure, the denial of discharge mandated by § 727(a)(4)(A) is extended to the Debtor's own case under § 727(a)(7).

### b. The CTC Transfers

The Trustee next alleges that CTC is an insider of RFM and of the Debtor, and that the Debtor's omission of the transfers made to CTC from RFM's SOFA constitutes a false oath under § 727(a)(4), warranting a denial of the Debtor's discharge under § 727(a)(7).

The Debtor responds that RFM was not required to list transfers made to CTC within one year of the petition date on its SOFA because CTC was not an insider of RFM, but rather an independent subcontractor providing union labor to enable RFM to timely complete several large construction projects in 2009. (Ans. to Compl. at ¶ 39.) The Court rejects this argument because the evidence establishes that CTC was in fact an insider of RFM.

In determining whether an entity is an "insider" under the § 101(31) definition of that term, courts have "looked to the closeness of the relationship between the parties and to whether

any transactions between them were conducted at arm's length." *Krehl*, 86 F.3d. at 742. The following facts demonstrate a level of closeness negating any claim that the transactions between RFM and CTC were conducted at arm's length:

- The parties do not dispute that CTC was formed to "kind of keep everything in house" and to act as an "arm" of RFM, its sole customer, furnishing labor for the taping and finishing work on RFM's drywall installation projects. (Jt. Pretrial Stmt. at p. 10.)

- CTC's owner, Peterson, is the sister of the Debtor, who is president and sole owner of RFM. (*Id.*)

- CTC was a subcontractor of RFM and received payments for its services directly from RFM, not from the general contractors with which RFM contracted. (*Id.*)

- The Debtor and Peterson never intended that CTC would make a profit. (*Id.* at p. 11.) They agreed that RFM would advance funds to CTC only as cash was available and was needed to pay CTC's payroll, union contributions, and other expenses. (*Id.*)

- CTC and RFM shared an office, for which RFM paid the rent and utilities. Peterson was the sole shareholder and president of CTC and the office manager of RFM.

These facts establish that RFM exercised significant control over CTC and that the relationship between them is so close that the Court cannot reasonably conclude that the transactions between them were conducted at arm's length. Accordingly, the Court finds that CTC was an insider of RFM.

Because the Court finds that CTC was an insider of RFM, it must conclude that RFM was required to disclose on its SOFA any transfers made to CTC within one year prior to the petition date. Whether RFM's failure to do so constitutes a false oath under § 727(a)(4)(A) depends upon whether the elements previously listed can be established.

- The Debtor made a statement under oath: For the same reasons previously discussed with respect to the AMI transfers, the Court finds that the statement made on RFM's SOFA with respect to the CTC transfers constitutes a statement under oath for purposes of § 727(a)(4)(A).

- The statement was false: In response to question 2 of its SOFA, RFM denied that it had made payments to creditors who are insiders within one year prior to its petition date. (Ans. to Compl. at ¶ 34.)  Because RFM admits that it made transfers totaling $858,500 to CTC, an insider, within one year of the bankruptcy filing, the Court finds that the omission of these transfers is a false statement.  (*See* Ans. to Compl. at ¶ 29.)

- The Debtor knew the statement was false: For the reasons previously stated regarding the AMI transfers, the Court finds that the Debtor knew that RFM's SOFA contained a false statement.

- The Debtor made the statement or caused the omission with intent to deceive: The Court also finds that the Debtor intentionally caused RFM not to disclose the transfers to CTC within the one-year pre-petition period.  The Debtor testified that he had been contemplating filing a bankruptcy petition for RFM since September 2009.  This was therefore not a case in which it can plausibly be claimed that the SOFA was prepared so hastily that the omissions were inadvertent. In addition, because the Debtor had experience in the preparation of such financial documents as the collateral reports to his lender, the Court concludes that he would not have been overmatched by the challenge of filing a SOFA.  The Court finds that these omissions were not inadvertent, but were made with the intent to put the transfers beyond the reach of the Trustee and creditors of RFM's estate.

- The omission was material: The Court also finds the amount of the omission sizeable enough to constitute a material omission for purposes of § 727(a)(4)(A). RFM's SOFA disclosed transfers of $196,562.50 to CTC (Pl. Ex. No. 2 at pp. 27-28), but in his answer to the complaint, the Debtor admitted that RFM transferred $858,500 between January 1, 2009, and the petition date.  (Ans. to Compl. at ¶ 29.)  The failure to disclose these transfers is material to the bankruptcy estate.

Accordingly, the Court finds that RFM's failure to disclose on its SOFA transfers made to CTC within one year of RFM's petition date constitutes the making of a false oath under § 727(a)(4)(A).  Because the Court further finds that the Debtor is responsible for this failure, the denial of discharge mandated by § 727(a)(4)(A) is extended to the Debtor's own case under § 727(a)(7).

The Debtor attempts to avoid this result by arguing that he is absolved from responsibility under § 727(a)(4)(A) because he relied on his counsel to prepare his and RFM's SOFAs, and that he complied with whatever was requested of him by his bankruptcy counsel .  The Debtor

testified that he did not review RFM's bankruptcy petition, schedules and SOFA before they were filed. According to the Debtor, he should not be held accountable for omissions that were the fault of his attorney.

This argument is unpersuasive. The purpose of § 727(a)(4)(A) is to enforce a debtor's duty of disclosure and to ensure that the debtor provides reliable information to those who have an interest in the administration of the estate. *Brandt v. Carlson (In re Carlson)*, 231 B.R. 640, 655 (Bankr. N.D. Ill. 1999), *aff'd*, 250 B.R. 366 (N.D. Ill. 2000), *aff'd*, 263 F.3d 748 (7th Cir. 2001). The trustee and the creditors have a right to information that will allow them to evaluate the case and administer the estate's property. *Clean Cut Tree Serv., Inc. v. Costello (In re Costello)*, 299 B.R. 882, 899 (Bankr. N.D. Ill. 2003). "Passively signing an error-filled bankruptcy petition and schedules without reading them first can constitute reckless indifference to the truth and therefore fraud." *Cohen v. Olbur (In re Olbur)*, 314 B.R. 732, 746 (Bankr. N.D. Ill. 2004).

"[N]either a bankruptcy trustee nor a debtor's creditors should be required to engage in a laborious tug of war to drag out the truth in the glare of daylight." *Layng v. Benkowski (In re Benkowski)*, Bankr. No. 10-38603-jes, Adv. No. 11-2394, 2012 WL 2022526, at *2 (Bankr. E.D. Wis. June 5, 2012). Indeed, not only does the Court reject the Debtor's argument that these omissions should be attributed to his attorney's carelessness, but the Debtor's lack of concern about his own obligations in ensuring the accuracy of the bankruptcy petition and schedules independently justifies an inference of fraudulent intent. *See In re Olbur*, 314 B.R. at 746-47.

The Court finds that the Debtor is responsible for the omissions in RFM's SOFA, which constitutes a false oath under § 727(a)(4)(A). Therefore, the Court denies the Debtor's discharge under § 727(a)(7).

### 2.    The Debtor Violated § 727(a)(2)(A) with Respect to RFM's Bankruptcy Case

In Count I of the complaint, the Trustee alleges that the Debtor acted with intent to hinder, delay, or defraud creditors of RFM when he caused RFM to transfer substantial sums to CTC and AMI (Compl. at ¶ 39) within one year of the filing of RFM's bankruptcy petition. (*Id.* at ¶ 40.) The Trustee takes the position that these actions violate § 727(a)(2)(A) and therefore the Debtor's discharge should be denied under § 727(a)(7).

Under § 727(a)(2)(A), an objection to discharge will be sustained if the objecting party alleges and proves the following elements: (1) the debtor transferred, removed, destroyed, mutilated, or concealed property; (2) belonging to the estate; (3) within one year of filing the petition; (4) with the intent to hinder, delay, or defraud a creditor of the estate. *In re Kontrick*, 295 F.3d 724, 736 (7th Cir. 2002), *aff'd*, 540 U.S. 443 (2004); *Saluja v. Mantra (In re Mantra)*, 314 B.R. 723, 729 (Bankr. N.D. Ill. 2004).

A proper objection to discharge under § 727(a)(2)(A) "'consists of two components: an act (i.e., a transfer or a concealment of property) and an improper intent (i.e., a subjective intent to hinder, delay, or defraud a creditor).'" *Kontrick*, 295 F.3d at 736 (quoting *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir. 1993)). Both elements must have been present during the year before bankruptcy; anything occurring earlier is forgiven. *Id.*

The Trustee argues that the following transfers made during the ninety days prior to the petition date (the "Preference Period") demonstrate RFM's intention to prefer certain creditors over other creditors, giving rise to an inference of fraudulent intent under § 727(a)(2)(A): $188,562.50 to CTC; $72,000 to AMI; and $10,000 to SEC.

According to RFM's bankruptcy petition, these three insider creditors were paid in full as a result of these payments. (Pl. Ex. No. 2 at pp. 26-28.) By contrast, RFM paid its other

14

creditors only a small percentage of what was owed them or, in some cases, nothing at all. For example, RFM owed West Suburban Bank (the "Bank") more than $1.3 million, but paid the Bank only $72,258, less than six percent of the amount owed. (*Id.* at pp. 28-29.) Similarly, RFM paid Westmont Interior Supply House ("Westmont") only twenty-three percent of the amount RFM owed to it and made no payments at all with respect to the $269,490.63 RFM owed to the Chicago Carpenters Trust Funds for past due pension and welfare contributions for August through October 2009. (*Id.* at pp. 25-26)

The Trustee further alleges that, in addition to favoring insider creditors over other creditors, the Debtor caused RFM to make false statements to the Bank and Westmont to ensure that RFM would continue receiving project revenue that might otherwise have gone to retire the debts owed to the Bank or Westmont. (Pl. Post-trial brief at p. 8.) The Trustee also argues that the Debtor caused RFM to depart from its established course of dealing with CTC in order to allow CTC to accumulate cash. (*Id.*) According to the Trustee, the Debtor used the transfers to CTC, AMI, and SEC to remove property from RFM's estate and to direct it to insiders, thereby hindering or defrauding other creditors. (*See id.*) The Trustee contends that those transfers should be deemed fraudulent transfers for purposes of § 727(a)(2)(A).

The Court agrees that the evidence establishes that the Debtor caused RFM to make the transfers to CTC, AMI, and SEC within one year of the petition date, and that the funds transferred were property of RFM's estate. At issue is whether the Debtor caused RFM to make the transfers with the intent to hinder, delay, or defraud other creditors of the estate.

The Debtor testified that he first considered filing the bankruptcy case for RFM in September 2009, at which time RFM had no new work lined up. The Debtor also testified that he was responsible for the collateral reports RFM provided to the Bank for the loan. The Debtor

testified that when the loan value on the collateral reports was lower than the maximum loan amount, the Bank would call him to notify him that the loan was in default. The Debtor admitted that he would sometimes "adjust" the figures on the collateral reports so that they would appear to meet the collateral requirements, even when the Debtor knew that those adjustments were false. In particular, the Debtor admitted that he falsely adjusted the collateral amounts listed on the October 2009 collateral schedule[3] submitted to the Bank. (Pl. Ex. No. 4.) The Court finds that the Debtor's adjusting of collateral amounts in order to meet the Bank's collateral requirements establishes his fraudulent intent under § 727(a)(2)(A).

Based on the Debtor's admissions and the testimony introduced at trial, the Court finds that the Debtor caused RFM to act with the requisite intent to hinder, delay, or defraud its creditors as contemplated by § 727(a)(2)(A). Therefore, the Court denies the Debtor's discharge under § 727(a)(7).

### B.    Count III--11 U.S.C. § 727(a)(4)(A)

In Count III of the complaint, the Trustee alleges that the Debtor made false oaths within the meaning of § 727(a)(4)(A) when he filed his SOFA that failed to disclose the following:

- The sale, on April 21, 2009, of a 1968 Mustang automobile (the "Mustang") to the Debtor's mother, Barbara Hendron ("Ms. Hendron") (Compl. at ¶¶ 59 & 61);

- The sale, in 2009, of a Harley Davidson motorcycle (the "Motorcycle"), also to Ms. Hendron (*Id.* at ¶¶ 62 & 63); and

- A fifty percent interest in a claim against the developer of a condominium project in Hawaii known as the Honua Kai (the "Honua Kai Claim") (*Id.* at ¶¶ 64 & 67).

The Debtor does not dispute that he failed to disclose the sales of the Mustang and the Motorcycle within one year of the bankruptcy filing or the Honua Kai Claim on his original SOFA. (Pl. Ex. No. 1 at pp. 35-36.) The Debtor did, however, eventually disclose those sales to

---

[3] October 2009 was the month between the time the Debtor first consulted a bankruptcy attorney and the time that he caused RFM to file its bankruptcy petition.

the Trustee, and on May 6, 2010, he filed an amended SOFA that included the sale of the

Mustang but still made no mention of the sale of the Motorcycle. (Debtor Ex. No. 12.)

The Honua Kai Claim was mentioned on neither the SOFAs (both original and amended)

(*Id.*) nor the Schedules, which explicitly require the Debtor to list any "[o]ther contingent and

unliquidated claims of every nature . . . ." (Pl. Ex. No. 1; Debtor Ex. No. 12.) At trial, the

Debtor testified as to the nature of this claim. According to his testimony, the Debtor and his

former spouse, jointly with two friends and co-investors, put down a $155,000 deposit on a

townhouse under construction in Maui, Hawaii. (Ans. to Compl. at ¶ 66.) The deposit was

forfeited because the Debtor and his former spouse were unable to obtain the financing necessary

to close on the purchase. Although he initially believed the deposit to be unrecoverable, he was

subsequently advised by his co-investor that an attorney in Hawaii was planning to file a lawsuit

to recover deposits forfeited to the developer. The co-investor presented the Debtor with the

signature page of a contract to retain that attorney. As evidence of the Debtor's pursuit of the

Honua Kai Claim the Trustee offered the signed retainer agreement. (Pl. Ex. No. 16.) This four-

page document appears to have been signed by the Debtor and his former spouse on November

20, 2009. (*Id.*) The Debtor denied that it is his signature on the retainer agreement and asserted

that he never saw all four pages of it until the day before the trial.   He testified that he had been

given only the signature page of the agreement. The Debtor also stated that he did not tell his

bankruptcy attorney that he had signed a contract for the litigation, and that he never discussed

the claim with his attorney. However, prior to RFM's bankruptcy filing, the Debtor caused RFM

to advance costs for legal representation concerning the Honua Kai Claim. (Ans. to Compl. at ¶

65.) He also testified that he receives email updates about every six to eight weeks from the

attorney in Hawaii.

The Court finds that the Debtor's omissions of the Mustang and the Motorcycle sales and of the Honua Kai Claim were material to the bankruptcy case.  The Debtor's omissions were material because they concerned not only the disposition of his property, but also the discovery of his assets and business dealings and transactions.  *See Stamat*, 635 F.3d at 982.

Finally, the Court finds that the Debtor made the false statements or omissions with the intent to deceive.  A showing of reckless disregard for the truth is sufficient to prove fraudulent intent.  *Id.*  Moreover, "the cumulative effect of false statements may, when taken together, evidence a reckless disregard for the truth sufficient to support a finding of fraudulent intent under section 727(a)(4)."  *Id.* (internal quotation omitted).  Mere negligence is insufficient, but the expectations are higher depending on the level of education, business experience, and sophistication of the debtor.  *Id.*  Numerous false oaths that a debtor knows to be inaccurate can have a "cumulative effect" making the false statements material and can establish "a pattern of reckless indifference to the truth."  *Id.* at 979.

The Court finds that the Debtor's omission of the sales of the Mustang and the Motorcycle and of the Honua Kai Claim on his original schedules and SOFA was intentional. Evidence that these omissions were deliberate is the fact the Debtor did indeed file an amended SOFA disclosing only the sale of the Mustang, but again omitting both the sale of the Motorcycle and the ongoing litigation regarding the Honua Kai Claim.  The Court finds these omissions were both material and deliberate.

The core of the Debtor's defense to the Trustee's allegations in Count III is that he cannot be held to have made false oaths because he never really swore an oath before this Court regarding the Mustang, the Motorcycle, or the Honua Kai Claim.  He seems to take the position that he barely had anything to do with the documents whose omission of reportable information

is the basis for Count III. According to the Debtor, he did not see the bankruptcy petition before it was filed. He did recall filling out a pre-petition questionnaire presented by his attorney, but neither the questionnaire nor his attorney asked about the Mustang or the Motorcycle. He never actually attested to the truth or accuracy of the information contained in the Schedules and the SOFA because he did not physically sign the schedules, but only "signed" them electronically, by his declaration for electronic filing. The Debtor testified that he did not prepare, receive or sign the schedules and the SOFA, nor was he asked to review them. (Jt. Pretrial Stmt. at p. 21.) According to the Debtor, he did not even see the amended SOFA until the day before trial in this proceeding. The false information and omissions in his original schedules and original and amended SOFAs were his bankruptcy attorney's fault. In short, the Debtor would have this Court believe that he was, in essence, an innocent bystander to his own bankruptcy case. The Court sees it otherwise.

The Court finds the Debtor's willful inattention to the accuracy of the petition, schedules and SOFAs he filed with this Court fully justifies an inference of fraudulent intent. *See id.* The Debtor is an intelligent and experienced businessman, knowledgeable in his industry, and certainly acquainted with financial matters. He knew or should have known of his obligation to truthfully and accurately report the matters he omitted.

He had the capacity, time, and resources to discharge his duties as an honest petitioner before this Court and as a fiduciary of his creditors. The Court finds that the Trustee has demonstrated that the Debtor made false statements under oath, that he knew the statements were false, that they were made with the intent to deceive, and that they were material to the bankruptcy case. Accordingly, the Debtor's discharge is denied under § 727(a)(4)(A).

### C.     Count IV—11 U.S.C. § 727(a)(3)

The Trustee next alleges that the Debtor's discharge should be denied under § 727(a)(3) which provides:

> (a) The court shall grant the debtor a discharge, unless–
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

"The purpose of § 727(a)(3) is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *Scott*, 172 F.3d at 969 (internal quotation omitted). "Section 727(a)(3) requires as a precondition to discharge that debtors produce records which provide creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Juzwiak*, 89 F.3d at 427 (internal quotation omitted). This statute "ensures that trustees and creditors will receive sufficient information to enable them to trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *Id.* at 427-28 (internal quotation omitted). The statute places an affirmative duty on the debtor to create books and records accurately documenting his financial affairs. *Id.* at 429 ("The debtor has the duty to maintain and retain comprehensible records."). Intent is not an element of proof under § 727(a)(3). *Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002); *Scott*, 172 F.3d at 969; *Juzwiak*, 89 F.3d at 430.

A creditor bears the initial burden of proving that the debtor failed to keep adequate records. *Costello*, 299 B.R. at 897. "Records are not 'adequate' if they do not provide the

trustee or creditors with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Bay State Milling Co. v. Martin (In re Martin)*, 141 B.R. 986, 995 (Bankr. N.D. Ill. 1992).   Every debtor has a duty to maintain and preserve records of their financial transactions and affairs. *Carlson*, 231 B.R. at 654.  The completeness and accuracy of a debtor's records are to be determined on a case-by-case basis, considering the size and complexity of the debtor's financial situation.  *Cmty. Bank of Homewood-Flossmoor v. Bailey (In re Bailey)*, 145 B.R. 919, 924 (Bankr. N.D. Ill. 1992).

The adequacy of a debtor's books and records is judged by the sophistication of the debtor's business and financial affairs.  *Christenson v. Lee (In re Lee)*, 415 B.R. 367, 376 (Bankr. E.D. Wis. 2009); *see Scott*, 172 F.3d at 970 ("where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping").   Courts consider the following factors when deciding whether a debtor's records are adequate: whether the debtor is engaged in business; the complexity and volume of business; the amount of debt; whether the failure to keep or produce records was the debtor's fault; the debtor's education, business experience, and sophistication; customary business practices for record keeping in the debtor's business industry; the degree of accuracy disclosed by the existing books and records; the extent of any egregious conduct by the debtor; and the debtor's courtroom demeanor.  *Lee*, 415 B.R. at 376.   Courts have broad discretion in deciding whether the books and records of a debtor are adequate and whether the failure to keep records is justified.  *Hunt v. O'Neal (In re O'Neal)*, 436 B.R. 545, 558 (Bankr. N.D. Ill. 2010); *Costello*, 299 B.R. at 897.

Count IV alleges several inadequacies in the Debtor's record-keeping. The Trustee first

asserts that he was unable to fully investigate the Debtor's financial affairs because the Debtor

failed to provide him with a 2009 individual federal income tax return. However, the Debtor did

eventually provide the Trustee with a copy of the filed return, enabling the Trustee to recover the

Debtor's refund of over $30,000 for the benefit of the estate. The Court therefore does not find

that the Trustee was unable to fully investigate the Debtor's financial affairs because of any

failure on the part of the Debtor regarding his 2009 individual tax return.

However, the Court does find that the Debtor failed to keep or preserve adequate

recorded information regarding the sales of the Motorcycle and the Mustang. The bill of sale

offered to memorialize the sale of the Motorcycle is an undated document prepared by the

Debtor himself and is in his handwriting. It is unclear from the face of the document when it

was prepared. (Pl. Ex. No. 11.) The document was unsubstantiated other than by the Debtor's

own self-serving testimony. (*Id.*) The document offered memorializing the sale of the Mustang

was similarly slapdash. (Pl. Ex. No. 12.) Although this document was notarized, there was no

evidence or other credible testimony offered to corroborate the facts stated in the document.

(*Id.*) As the work product of a man of the Debtor's level of sophistication in business, both

purported bills of sale appear suspiciously un-businesslike and are not credible as serious efforts

at record-keeping. Nor does the alleged bill of sale to Ms. Hendron regarding the sales of the

Motorcycle and the Mustang equate to a bill of sale that would be used by a reasonable

businessman. The Court therefore finds that the totality of the circumstances surrounding the

Motorcycle and the Mustang transactions constitutes inadequate financial record keeping.

The Trustee's final allegation under Count IV relates to the Debtor's complete failure to

account for the proceeds from the sales of the vehicles. According to the purported bill of sale

and the Debtor's testimony, the Debtor received $5,000 in cash for the Motorcycle. (Pl. Ex. Nos.

11 & 12.)  The purported bill of sale, along with the Debtor's amended SOFA, indicate that on

April 21, 2009, the Debtor received $7,000 in cash for the Mustang.   No clue as to the

disposition of this total of $12,000 in cash can be found in any document filed with this Court or

in the Debtor's testimony.  At trial, he testified that he could not recall what he did with the cash,

that he did not deposit the cash into a checking account because he never deposited cash into a

bank, that he did not know where the cash went, and that he did not have any receipts related to

the cash. The Court can imagine no more egregious failure of a debtor's duty to keep or preserve

adequate records than this lack of any scrap of paper accounting for the disposition of cash in

such a sizeable amount.

     The Court finds that, as to the sales of the Mustang and Motorcycle and the disposition

of the proceeds, the Debtor failed to keep or preserve documents, records, or papers from which

his financial condition or business transactions might be ascertained.  The Debtor's discharge is

therefore denied under § 727(a)(3).

## V.  MOTION IN LIMINE

     Finally, the Court will address the motion in limine filed by the Debtor (the "Motion in

Limine").   The Debtor contends that the Court should exclude certain testamentary and

documentary evidence because it was not referenced in the complaint.   For the following

reasons, the Court disagrees and denies the Motion in Limine.

     According to the Debtor, the Trustee has conceded that there was no "false oath claim"

asserted in either the original or amended complaint.  The "false oath claim," as referenced by

the Debtor, relates to the Trustee's allegations that the Debtor caused RFM to make a false oath

or oaths within the meanings of § 727(a)(3), (a)(4), and (a)(7).  The Debtor argues that because

the Trustee did not include a discussion of the alleged false oath claim in the Joint Pretrial

Statement filed on December 6, 2012, he cannot now advance this theory.  According to the Debtor, by failing to include the allegations related to the claim in the Joint Pretrial Statement, the Trustee has conceded that no such claim exists.  The Debtor also contends that any evidence related to a certain collateral report prepared by the Debtor and certain contractor's affidavits also prepared by the Debtor should be excluded because they support arguments not previously advanced by the Trustee.  The Court disagrees.

First, the Court finds that the Debtor was on notice that the Trustee intended to proceed on the theory that the Debtor caused RFM to make certain omissions or false oaths, on its SOFA. The complaint specifically alleges that the Debtor caused RFM to falsely state in its response to question 3 on its SOFA that it made no transfers to insiders within one year of RFM's petition date. (Compl. at ¶¶ 42, 43, & 44.)  The Court therefore finds that the Debtor was on notice of the claims against him under § 727(a)(2) as required by Fed. R. Civ. P. 8.  *See Kennicott Bros. Co. v. Fidanovski (In re Fidanovski)*, 347 B.R. 343, 348 (Bankr. N.D. Ill. 2006).

In addition, there were two separate pretrial orders and corresponding joint pretrial statements entered in this adversary proceeding:  The first Pretrial Order was entered in this adversary proceeding on June 17, 2011, by this Court's predecessor in this case, Judge John H. Squires, and in compliance therewith, the parties filed the first Joint Pretrial Statement on September 2, 2011. (Doc. Nos. 16 & 18.)  The original trial date was stricken, and a subsequent Final Pretrial Order was entered by this Court on July 20, 2012.  (Doc. No. 46.)  On December 6, 2012, the parties filed a second Joint Pretrial Statement.  (Doc. No. 63.)

Based upon the pleadings presented, including the complaint as well as both the first and second pretrial orders and statements, the Court finds that the Debtor had more than sufficient notice of the claims against both him and RFM under § 727(a)(3), (a)(4), and (a)(7), and was also

put on notice of the claims and theories the Trustee intended to advance in presenting his case.
The Court also finds that the Trustee was not required to amend the complaint to incorporate new
facts learned in discovery: "A complaint does not have to plead evidence, and a plaintiff in no
way risks dismissal (let alone defeat at trial) because his complaint does not set forth a complete
and convincing picture of the alleged wrongdoing." *Fidanovski*, 347 B.R. at 348 (internal
quotation omitted).

The Debtor argues that the Court should exclude any evidence relating to the collateral
report he prepared for his lender, and certain contractors' affidavits he also prepared and
submitted on behalf of RFM. But simply because the Trustee did not amend the complaint to set
forth each new fact or piece of evidence learned in discovery does not provide a basis for
excluding the evidence or related arguments, as the Debtor argues it should. Therefore, the
Court declines to find that the Trustee asserted any new theory of recovery based upon the
alleged false oath claim. Rather, the Court finds that these allegations and the related evidence
were part of the record and related pleadings, and the Debtor was on notice of those claims
against him.

Motions in limine are intended to deal with discrete evidentiary issues and are not devices
for resolving factual disputes or substantive questions. *Graves v. Dist. of Columbia*, 850
F.Supp.2d 6, 10-11 (D.D.C. 2011). In resolving the evidentiary questions raised, the Court
assesses the probative value of the proffered evidence and weighs any factors against
admissibility. *See id.* at 11. Particularly in a bench trial, preventing unfair prejudice or
confusion of the issues is much less of a concern than in a jury trial. *See, e.g., Romanelli v. Long
Island R.R. Co*, 898 F.Supp.2d 626, 629-30 (S.D.N.Y. 2012). The Court finds no unfair
prejudice or confusion of the issues with respect to the evidence of the false collateral report or

the contractors' affidavits. The Court has weighed the probative value of the evidence against the potential for unfair prejudice or confusion of issues, and finds that the evidence is admissible. Accordingly, the Motion in Limine is denied.

## VI. CONCLUSION

For the foregoing reasons, the Court denies the Debtor's discharge under § 727(a)(3), (a)(4)(A), and (a)(7).

ENTERED:

DATE:  **AUG 1 2 2013**

*Donald R. Cassling*
**Donald R. Cassling**
**United States Bankruptcy Judge**